1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   DENNIS C. PAYNE, et al.,

12                  Plaintiffs,                    No. 2:20-cv-01198-TLN-AC

13

14          v.                                     **ORDER**

15   GENERAL ELECTRIC COMPANY,
     et al.,
16
                    Defendants.
17

18          This matter is before the Court on Plaintiffs Dennis C. Payne ("Mr. Payne") and Susan

19   Payne's ("Plaintiffs") Motion for Summary Adjudication (ECF No. 178) and Defendant General

20   Electric Company's ("General Electric") Motion for Summary Judgment (ECF No. 179).  Both

21   motions are fully briefed.  (ECF Nos. 196, 197, 199, 207, 208, 209.[1])  As set forth below, both

22   Plaintiffs' Motion for Summary Adjudication and General Electric's Motion for Summary

23   Judgment are GRANTED in part and DENIED in part.[2]

24

25   [1]      Defendants Alfa Laval, Inc. ("Laval") and Tate Andale, LLC ("Andale") also filed
     oppositions, which are now moot.  (ECF Nos. 195, 198, 200.)  Laval was dismissed from this
26   action with prejudice (ECF No. 217) and Andale settled (ECF No. 225).

27
     [2]      The Court already denied Plaintiffs' Motion for Summary Adjudication as to Andale
28   based on the parties' settlement.  (ECF No. 225.)

                                                    1

1    **I.      FACTUAL AND PROCEDURAL BACKGROUND**[3]

2           The instant action arises out of Mr. Payne's alleged exposure to asbestos while working

3    aboard a ship called the Golden Bear II.[4]  Plaintiffs allege this exposure led to his ultimate death

4    from mesothelioma.  (ECF No. 134 ¶ 1.)  The Golden Bear II was originally built under a U.S.

5    Maritime Commission contract and named the S.S. Del Orleans.[5]  (ECF No. 197-1 at 1–2.)  The

6    ship was completed and launched in 1940.  (*Id.* at 1; ECF No. 208 at 15.)  General Electric was

7    contracted to manufacture the turbine for the ship, which consisted of a high pressure section, a

8    low pressure section, and a reduction gear.  (ECF No. 199-1 at 5; ECF No. 208 at 15.)  General

9    Electric started manufacturing the turbine in 1939 and delivered it to the shipbuilder in 1940.

10   (ECF No. 199-1 at 5.)  In 1941, the ship was acquired by the Navy and later redesignated the USS

11   Crescent City.  (ECF No. 208 at 16.)  The USS Crescent City was then loaned to the California

12   Maritime Academy to use as a training ship and was renamed the Golden Bear II.  (ECF No. 197-

13   1 at 5; ECF No. 208 at 16.)  The federal government funded repairs to the Golden Bear II and

14   required that in fitting the ship for service, all requirements of the American Bureau of Shipping,

15   Coast Guard, and other regulatory agencies be satisfied.  (ECF No. 208 at 17.)  The Maritime

16   Administration ("MARAD") administered the Golden Bear II, authorized any expenditures

17   necessary for proper maintenance and upgrades of equipment, and approved all work on the ship.

18   (*Id.*)

19          Mr. Payne was a marine engineering student at the California Maritime Academy from

20   August 1972 to July 1975.  (ECF No. 197-1 at 5; ECF No. 208 at 25.)  In February 1975, while

21   Mr. Payne was still a student, the Golden Bear II was on maneuvers in Panama when a turbine

22   problem developed.  (ECF No. 208 at 20.)  The vessel was brought into port, and the California

---

[3]      The following facts are undisputed unless otherwise stated.

[4]      The parties refer to this ship interchangeably as the "Golden Bear II" and the "TS Golden Bear II."  (*See, e.g.*, ECF No. 197-1 at 5.)  For purposes of this order, the Court refers to this ship as the Golden Bear II.

[5]      The parties refer to this ship interchangeably as the "SS Del Orleans" and "SS Delorleans."  (*Compare* ECF No. 197-1 at 1, *with* ECF No. 208 at 15.)  For consistency and for purposes of this order, the Court refers to this ship as the S.S. Del Orleans.

Maritime Academy's Chief Engineer, instructors, and students inspected the turbine by first removing the horizontal joint insulation from the high pressure section's horizontal joint. (*Id.*) Mr. Payne observed the turbine inspection and removal process, but did not remove insulation or open and inspect the turbine himself. (*Id.*) After California Maritime Academy instructors and students removed insulation and opened and inspected the turbine, representatives from MARAD and General Electric came aboard to view the turbine interior. (*Id.*) Mr. Payne never worked for or took direction from a General Electric representative. (*Id.* at 21.)

On June 15, 2020, Plaintiffs filed the instant action. (ECF No. 1.) Plaintiffs filed a Second Amended Complaint on March 21, 2023, claiming: (1) negligence under maritime law; (2) negligence under California law; (3) breach of express and implied warranties; (4) strict liability under maritime law; (5) strict liability under California law; and (6) loss of consortium. (ECF No. 134.)

Plaintiffs subsequently filed the instant Motion for Summary Adjudication and General Electric filed a cross Motion for Summary Judgment. (ECF Nos. 178, 179.)

## II.    EVIDENTIARY OBJECTIONS

To clarify the record on summary judgment, the Court first rules on General Electric's objections to Arnold Moore's report ("Moore report"), which Plaintiffs submit in support of their Motion for Summary Adjudication. (ECF No. 197-2.) General Electric's additional objections to Plaintiffs' evidence are ruled upon throughout the order when relevant. (ECF No. 209-1.) The objections to evidence the Court does not rely upon are DENIED as moot.

### A.    Arnold Moore's Report

General Electric objects and moves to exclude the Moore report in its entirety for two reasons. First, General Electric argues the Moore report is unsworn and unaccompanied by a declaration attesting to Moore's ability to testify to the report's content. (ECF No. 197-2 at 1–2.) In response, Plaintiffs state they will file a declaration from Moore to cure any deficiency. (ECF No. 207 at 4.) On June 11, 2024, Plaintiffs filed a signed declaration from Arnold Moore attesting to his ability to testify to the report's content. (ECF No. 211.)

While General Electric is correct that generally unsworn expert reports are inadmissible,

1    *see Liebling v. Novartis Pharms. Corp.*, No. CV1110263MMMMRWX, 2014 WL 12576619, at

2    \*2 (C.D. Cal. Mar. 24, 2014) (collecting cases), the Ninth Circuit emphasizes a "policy favoring

3    disposition on the merits[.]" *In re Eisen*, 31 F.3d 1447, 1454 (9th Cir. 1994).  Given this policy,

4    the Court allows Plaintiffs to "cure" the Moore report through the belatedly signed declaration.

5    *See Medina v. Mapes*, No. 1:21-CV-00844-JLT-EPG, 2024 WL 1722270, at \*2 (E.D. Cal.

6    Apr. 19, 2024) (similarly allowing Plaintiffs to cure deficient expert report).

7            General Electric's second argument is that the Moore report is unreliable because it

8    contains statements that contradict Moore's sworn deposition testimony.  (ECF No. 197-2 at 2–5.)

9    In response, Plaintiffs argue Moore's report does not contradict his deposition testimony.

10   (ECF No. 207 at 2.)  Plaintiffs contend that General Electric cites no contradictory statement

11   made in Moore's report and any purported contradictions with his deposition testimony are taken

12   out of context.  (*Id.* at 3–4.)

13          The Court agrees with Plaintiffs and finds General Electric's objection to be meritless.

14   First, General Electric argues Plaintiffs cite to Moore's report to support their argument that

15   General Electric should have provided danger warnings for asbestos-containing gaskets, but

16   Moore stated in deposition that Mr. Payne was not present for the removal of any such gaskets.

17   (ECF No. 197-2 at 3.)  The fact that Plaintiffs cite to Moore's report to support this argument

18   does not undermine the report — if anything, this is simply an unpersuasive citation.  Second,

19   General Electric contends Moore states in his report that it was likely many repair parts for

20   machinery on the Golden Bear II were ordered from the original equipment manufacturers, but in

21   deposition he admitted he cannot tie General Electric to any of the pertinent replacement parts

22   used during Mr. Payne's time on the ship.  (*Id.*)  Again, Moore's statement in deposition does not

23   directly contradict his general statement in his report.  (ECF No. 178-4 at 37; ECF No. 197-6 at

24   148.)

25          General Electric's other citations to Moore's deposition statements are presented without

26   explanation as to how they discredit his report, and the Court finds these statements provide no

27   reason to exclude his report.  (*Id.* at 4–5.)

28          In sum, the Court has considered General Electric's objection to the Moore report and

1  finds the challenge lacks merit.  Accordingly, General Electric's objection to the Moore report is

2  OVERRULED.

3     **III.    STANDARD OF LAW**

4        A.    Summary Judgment

5        Summary judgment is appropriate when the moving party demonstrates no genuine issue

6  of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

7  R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

8  judgment practice, the moving party always bears the initial responsibility of informing the

9  district court of the basis of its motion, and identifying those portions of "the pleadings,

10  depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

11  that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

13  at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

14  solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

15  324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a

16  party who does not make a showing sufficient to establish the existence of an element essential to

17  that party's case, and on which that party will bear the burden of proof at trial.

18        If the moving party meets its initial responsibility, the burden then shifts to the opposing

19  party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus.*

20  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.*

21  *Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of a factual dispute,

22  the opposing party may not rely upon the denials of its pleadings but is required to tender

23  evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

24  support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

25  demonstrate that the fact in contention is material, *i.e.*, the fact might affect the outcome of the

26  suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that

27  the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for

28  the nonmoving party.  *Id.* at 251–52.

1          In the endeavor to establish the existence of a factual dispute, the opposing party need not

2    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4    trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is

5    to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

6    trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) Advisory Committee

7    Note (1963)).

8          In resolving a summary judgment motion, the court examines the pleadings, depositions,

9    answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed.

10   R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence

11   of the opposing party is to be believed and all reasonable inferences that may be drawn from the

12   facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S.

13   at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

14   obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

15   *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir.

16   1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party

17   "must do more than simply show that there is some metaphysical doubt as to the material facts."

18   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  "Where the record taken as a whole could not lead

19   a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. at

20   587.

21                  B.    <u>Maritime Law</u>

22         The parties do not dispute federal maritime law — "an amalgam of traditional common-

23   law rules, modifications of those rules, and newly created rules" — governs this case.  *McIndoe v.*

24   *Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting *E. River S.S. Corp. v.*

25   *Transamerica Delaval Inc.*, 476 U.S. 858, 865 (1986)); (ECF No. 179-1 at 15 n.8; *see generally*

26   ECF Nos. 134, 199.)  Application of federal maritime law "does not result in automatic

27   displacement of state law." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513

28   U.S. 527, 545 (1995).  Rather, state law may be used to supplement federal maritime law where it

1   is "compatible with substantive maritime policies." *Yamaha Motor Corp., U.S.A. v. Calhoun*,

2   516 U.S. 199, 207 (1996).  However, state law is not generally applied where it would be

3   "inconsonant with the substance of federal maritime law." *Id.* at 207.

4       **IV.    ANALYSIS**

5       The Court begins by examining General Electric's Motion for Summary Judgment before

6   turning to Plaintiffs' Motion for Summary Adjudication.

7           A.      General Electric's Motion for Summary Judgment

8       General Electric argues four separate and independent grounds entitle it to summary

9   judgment.  (ECF No. 179 at 2.)  First, Plaintiffs lack evidence of exposure to an asbestos-

10  containing product made or supplied by General Electric sufficient to prove causation of

11  Mr. Payne's alleged injury under maritime law.  (*Id.*)  Second, there is no causal connection

12  between any failure to warn and Mr. Payne's injury.  (*Id.*)  Third, General Electric owed no duty

13  to warn under the Supreme Court's decision in *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446

14  (2019).  (*Id.*)  Fourth, Plaintiffs' claims for non-pecuniary loss and loss of consortium are not

15  available under maritime law.  (*Id.*)  The Court addresses these arguments in turn.

16          *i.      Causation under Maritime Law*

17      First, General Electric argues there is no credible evidence demonstrating Mr. Payne was

18  exposed to any asbestos related to a turbine manufactured by General Electric, let alone that he

19  was regularly exposed to a specific asbestos-containing product over an extended period of time

20  aboard the Golden Bear II.  (ECF No. 179-1 at 16.)  Plaintiffs disagree and argue they have

21  presented substantial evidence sufficient to show asbestos from General Electric's products was a

22  substantial factor in the development of Mr. Payne's mesothelioma.  (ECF No. 199 at 17–19.)

23      In reply, General Electric argues Plaintiffs rely on four generic and/or unsworn expert

24  reports which do not establish causation.[6]  (ECF No. 209 at 8.)  According to General Electric,

25  _____

26  [6]      General Electric argues Plaintiffs submit two expert reports — by Dr. Barry Horn and
    Dr. David Zhang — that are unsworn, contain no declaration under penalty of perjury, and should
27  be stricken as inadmissible.  (ECF No. 209 at 8 n.5.)  Plaintiffs made no attempt to cure these
    issues.  As such, the Court STRIKES the Horn and Zhang reports and does not consider these
28  reports in deciding the instant motion for summary judgment.

                                                    7

1    there is no admissible evidence demonstrating Mr. Payne was exposed to any asbestos related to a

2    turbine manufactured by General Electric.  (*Id.* at 9.)

3         Under maritime law, to establish causation for an asbestos claim, Plaintiffs must show that

4    (1) Mr. Payne was actually exposed to an asbestos-containing product related to General

5    Electric's turbine, and (2) the product was a substantial factor in causing the injury Mr. Payne

6    suffered.  *See McIndoe*, 817 F.3d at 1174.

7                              *a)     Actual Exposure*

8         It is undisputed that Golden Bear II was propelled by a single General Electric turbine

9    consisting of a high pressure section, a low pressure section, and a reduction gear.  (ECF No. 199-

10   1 at 5.)  Therefore, the question before the Court is whether Plaintiffs have presented sufficient

11   evidence for a reasonable jury to find Mr. Payne was exposed to an asbestos-containing product

12   related to the turbine.  While General Electric argues Plaintiffs have offered nothing other than

13   "unsupported allegations and speculation[,]" to show Mr. Payne was exposed, the Court

14   disagrees.  (*See* ECF No. 179-1 at 16.)

15        First, Plaintiffs cite to Mr. Payne's deposition where he states he observed an inspection

16   on the General Electric turbines in March 1975 aboard the Golden Bear II.  (ECF No. 199 at 19

17   (citing ECF No. 199-7 at 3, 6–8).)  Mr. Payne states that while he was observing the inspection,

18   gaskets had to be removed, along with lagging and insulation blankets.  (ECF No. 199-7 at 6–8.)

19   Mr. Payne further stated he could see dust from the maintenance work and one of his classmates

20   blew the asbestos insulation off of the casing of the turbine.  (*Id.* at 6, 10.)  Mr. Payne's

21   classmate, Michael O'Callaghan, who was also present on the Golden Bear II during the

22   inspection in March 1975, confirmed that during the inspection, the insulation was removed from

23   the turbine and studs were disassembled and lifted in order to access the turbine.  (ECF No. 199-8

24   at 4–5.)

25        Plaintiffs also provide photographs Mr. Payne took during the inspection.  (ECF No. 199-

26   9.)  Plaintiffs' expert, Michael Poulson ("Poulson"), who did asbestos insulation abatement work

27   on the Golden Bear II in the early 1980s, examined these photographs during his deposition and

28   testified that in his opinion, the insulation around General Electric's turbine was asbestos

                                          8

1    insulation.[7]  (ECF No. 199-13 at 9.)

2         Taken together, this is sufficient evidence — that goes beyond unsupported allegations

3    and speculation — for a reasonable jury to find Mr. Payne was exposed to asbestos insulation

4    related to General Electric's turbines.

5                                    b)     *Substantial Factor*

6         Having found there is sufficient evidence for a reasonable jury to find exposure, the next

7    question is whether such exposure was a substantial contributing factor to Mr. Payne's

8    mesothelioma.  "[M]inimal exposure" is insufficient — Plaintiffs must show Mr. Payne had "a

9    high enough level of exposure that an inference that the asbestos was a substantial factor in the

10   injury is more than conjectural."  *McIndoe*, 817 F.3d at 1174 (quoting *Lindstrom*, 424 F.3d at 492

11   (internal citation omitted)).

12        In *McIndoe*, the Ninth Circuit affirmed the district court's decision that plaintiffs had

13   failed to demonstrate exposure to asbestos for a substantial amount of time.  817 F.3d at 1176.

14   The Ninth Circuit found that at most, the evidence showed, "McIndoe was 'frequently' present

15   during the removal of insulation" and "present 20-30 times during such removal" and this was

16   insufficient under the substantial factor prong.  *Id.*  In making this decision, the Ninth Circuit

17   emphasized that plaintiffs failed to present any evidence regarding the amount of exposure or

18   duration of asbestos exposure during any of these incidents.  *Id.*

19        Here, Plaintiffs argue they have provided much more substantial evidence than in

20   *McIndoe*.  (ECF No. 199 at 17–19.)  Specifically, Plaintiffs present evidence that Mr. Payne

21   worked directly on the General Electric turbine during his time at the California Maritime

22   Academy and he personally came into contact with the insulation on the turbine "all the time"

23   from which there was dust that he could see.  (ECF No. 199-7 at 3, 5–6.)  Plaintiffs also present

24   _____

25   [7]      General Electric objects to Poulson's opinion as an inadmissible opinion under Federal
     Rule of Evidence ("Rule") 702 because Poulson provides no data or other acceptable foundation
26   upon which he bases his opinion.  (ECF No. 209-1 at 4–5.)  This objection is OVERRULED.
     During his deposition, Poulson explained how he was able to determine the insulation was
27   asbestos-based — by the way the insulation was applied and by the way it looked.  Given
     Poulson's background as an asbestos abatement expert, the Court finds this testimony satisfies the
28   requirements of Rule 702.

                                              9

1  evidence that in March 1975 there was an inspection of the General Electric turbine that took

2  approximately four to seven days and Mr. Payne spent "hours" on watch approximately ten feet

3  away.  (*Id.* at 8, 13.)

4          As to the amount of exposure, Plaintiffs also provide evidence that "no amount of

5  exposure to asbestos above the background levels present in the ambient air has been established

6  as too low to induce mesothelioma."  (ECF No. 199-17 at 23.)  Specifically, Plaintiffs cite an

7  expert report which indicates removal of asbestos insulation can appear dusty and lead to

8  exposure concentrations of 1.4 to 3.0 million parts per cubic foot.  (ECF No. 199-15 at 50.)

9  According to Plaintiffs' expert, the work Mr. Payne performed and the work he observed on

10  General Electric's turbines aboard the Golden Bear II would lead to the release of high

11  concentrations of airborne asbestos fibers above background concentration levels.  (*Id.* at 91.)

12          Drawing all reasonable inferences in Plaintiffs' favor, the Court finds Plaintiffs have

13  presented more evidence than in *McIndoe* from which a reasonable jury could infer the amount

14  and duration of Mr. Payne's asbestos exposure.  While this may be a close call, when viewing the

15  evidence in the light most favorable to Plaintiffs, the Court finds there is a triable issue of fact as

16  to whether exposure to asbestos-containing products related to General Electric's turbine was a

17  substantial factor in causing his injuries.  Accordingly, General Electric's Motion for Summary

18  Judgment on the matter of causation is DENIED.

19                              *ii.      Causal Connection*

20          Next, General Electric argues there is no causal connection between any failure to warn

21  and Mr. Payne's injury.  (ECF No. 179-1 at 17.)  According to General Electric, no warning it

22  could have put on the bare metal turbines it delivered in 1940 would have prevented Mr. Payne's

23  injury.  (*Id.* at 17–18.)  Relying on *Conti v. Ford Motor Co.*, General Electric argues the evidence

24  must "support a reasonable inference, rather than a guess, that the existence of an adequate

25  warning may have prevented the accident."  (*Id.* at 17 (quoting 743 F.2d 195, 197 (3d Cir.

26  1984)).)

27          In opposition, Plaintiffs argue there were multiple opportunities for General Electric to

28  provide warnings that may have prevented Mr. Payne's injury.  (ECF No. 199 at 16–17.)

1    Specifically, Plaintiffs contend General Electric could have put a warning in the instruction book

2    that was provided with the turbine or taken advantage of its ongoing relationship with the

3    Maritime Academy and MARAD and warned either entity.  (*Id.* at 16.)  Alternatively, Plaintiffs

4    posit General Electric's representative could have issued a warning when the representative saw

5    the students at the Maritime Academy were working on the turbine without taking precautions.

6    (*Id.*)  Further, Plaintiffs point to Mr. Payne's testimony where he stated that if he had known

7    about the hazard asbestos posed and had been warned about it, he would have utilized a protective

8    breathing mask.  (*Id.* (citing ECF No. 199-7 at 21).)

9        In reply, General Electric maintains there is nothing it could have placed on a turbine in

10   1940 that would have caused Mr. Payne to alter his behavior in 1975.[8]  (ECF No. 209 at 9.)

11   Further, General Electric disputes that one of its representatives saw Maritime Academy students

12   being exposed to asbestos.  (*Id.*)  General Electric then goes on to claim that the General Electric

13   technician who went onboard the Golden Bear II was not hired to train, tutor, or teach the cadets

14   and was at all times under the direction and control of the Maritime Academy shipboard officers.

15   (*Id.* at 10.)

16       The Court finds the issue of whether General Electric could have provided a warning that

17   may have avoided Mr. Payne's injury presents a question of fact for the jury to decide.  During

18   his deposition, when asked how he would have responded to an individual from General Electric

19   stating there was a hazard with respect to the asbestos in certain materials that were being

20   disturbed, Mr. Payne stated "I'm not sure I can answer how I would have reacted 45 years ago to

21   something like that.  Because I have so much more knowledge about the hazards of asbestos now.

22   It's just – I – I – I can't answer that.  I don't know what I would have done back then."  (ECF No.

23   183 at 83–84.)  However, Mr. Payne also stated that if he had been told about the hazards with

24   asbestos-containing products, he would have taken that information "seriously and put on some

25   kind of protective breathing mask[.]"  (ECF No. 199-7 at 21.)

26       The Court finds Mr. Payne's deposition testimony is sufficient to establish a dispute of

27

28   [8]      As detailed later, the Court finds this argument unavailing.  General Electric had a
     continuing duty to warn that did not end when it delivered the turbine in 1940.

1  fact as to whether a warning may have prevented Mr. Payne's injuries.[9]  Accordingly, General

2  Electric's Motion for Summary Judgment on the matter of the causal connection between any

3  failure to warn and Mr. Payne's injury is DENIED.

### iii.    Duty to Warn under DeVries

5  In *DeVries*, the Supreme Court held that in the maritime tort context, a product

6  manufacturer, such as General Electric, "has a duty to warn when (i) its product requires

7  incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated

8  product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to

9  believe that the product's users will realize that danger." 586 U.S. at 457.  General Electric

10  argues it owed no duty to warn under *DeVries* because Plaintiffs have not and cannot prove any

11  of the requisite elements.  (ECF No. 179-1 at 18–21; ECF No. 209 at 5–8.)  Plaintiffs disagree.

12  (ECF No. 199 at 14–16.)  The Court examines each element in turn.

### a)    Whether General Electric's Turbines Required Incorporation of Asbestos-Containing Parts

15  In *DeVries*, the Supreme Court noted several scenarios would satisfy this "requirement"

16  element.  586 U.S. at 457.  These include where a manufacturer directed the part to be

17  incorporated, the manufacturer itself made the product with a part that the manufacturer knew

18  would require replacement with a similar part, or where the product would be useless without the

19  part.  *Id.*

20  General Electric argues the undisputed facts demonstrate it did not direct the asbestos

21  insulation be used with the turbine, and its turbines would not be useless without the asbestos

22  insulation.[10]  (ECF No. 179-1.)  In opposition, Plaintiffs contend General Electric did direct that

23  asbestos-containing parts be incorporated, and the turbine could not have been used without

24  asbestos insulation at the time.  (ECF No. 199 at 15.)  To support this, Plaintiffs cite the 1939

---

25  [9]    Given this finding, the Court does not resolve General Electric's arguments in reply

26  regarding Plaintiffs' additional pieces of evidence.  (ECF No. 209 at 9–10.)

27  [10]    General Electric also argues it did not incorporate the asbestos insulation itself.  (ECF No.

28  179-1 at 19.)  Plaintiffs do not contest this in opposition, so the Court does not address this

argument.  (*See generally* ECF No. 199 at 15.)

1  Maritime Commission/Mississippi Shipping vessel construction specifications directed to

2  Bethlehem Steel, which state the "high and low pressure turbines shall be installed in accordance

3  with manufactures' practice and to the satisfaction of the Maritime Commission and the Owner."

4  (*Id.* (citing ECF No. 199-11 at 202).)  Next, Plaintiffs cite Michael Poulson's deposition

5  testimony where he stated the turbine "required insulation" and at the time, "the preferred choice

6  was asbestos insulation because it was readily available[.]"  (*Id.* (citing ECF No. 199-13 at 97).)

7  Finally, Plaintiffs cite Arnold Moore's report, which stated General Electric likely built the

8  turbines for the Golden Bear II the same way it built the turbines for DD 692 Class Destroyers.

9  (*Id.* (citing ECF No. 178-4 at 13).)  According to Moore's report, the turbines aboard the DD 692

10  Class Destroyers required the use of asbestos sheet gaskets, asbestos fiber insulation spacers, and

11  removable asbestos insulating pads.  (ECF No. 178-4 at 13.)

12      Drawing all reasonable inferences in Plaintiffs favor, the Court finds the evidence presents

13  a triable issue of fact as to whether General Electric required incorporation of asbestos-containing

14  parts for its turbines.

15                  b)      *Whether General Electric Knew or Had Reason to Know the*

16                          *Integrated Turbine was likely to be Dangerous for its*

17                          *Intended Uses*

18      The next *DeVries* element requires General Electric to have known or had reason to know

19  that its integrated product was likely to be dangerous for its intended uses.  586 U.S. at 457.

20  General Electric argues no evidence demonstrates it would have known in 1940 that the removal

21  of insulation from its turbine would exceed threshold asbestos values and cause disease to a

22  bystander.  (ECF No. 179-1 at 20.)  In opposition, Plaintiffs contend General Electric did know

23  about the hazards of asbestos and failed to warn users of those hazards.  (ECF No. 199 at 15.)

24  Specifically, Plaintiffs cite to a letter in 1972 where General Electric warned a purchaser of its

25  product that "stripping" the product to expose the conductor could result in airborne asbestos

26  fiber concentrations that exceeded the limits established by the Occupational Safety and Health

27

28

1    Act Standard.[11]  (*Id.* at 13 (citing ECF No. 199-21 at 2).)  In reply, General Electric contends the

2    time period at issue for evaluating this *DeVries* factor "logically must be when the turbines were

3    made and sold to the Navy."  (ECF No. 179-1 at 20 n.9 (citing *Joesphs v. Harris Corp.*, 677 F.2d

4    985, 988 (3rd Cir. 1982)).)  The Court disagrees.

5         In *DeVries*, the Supreme Court held a manufacturer has a duty to warn "*when* the

6    manufacturer knows or has reason to know that a required later-added part is likely to make the

7    integrated product dangerous for its intended uses[.]"  586 U.S. at 455–56 (emphasis added).  In

8    reaching its conclusion, the Supreme Court noted it was guided in part by "[m]aritime law's

9    longstanding solicitude for sailors[.]"  *Id.* at 456.  Courts in this district have looked to evidence

10   after the product was sold to evaluate this *DeVries* factor.  *See e.g.*, *Spurlin v. Air & Liquid Sys.*

11   *Corp.*, 537 F. Supp. 3d 1162, 1174 (S.D. Cal. 2021) (examining evidence of defendants'

12   knowledge around the time plaintiff served in the Navy).  Given this, it does not logically follow

13   from *DeVries* that General Electric's duty to warn under these circumstances stopped in 1940,

14   particularly given the fact General Electric provided some level of technical advice to its product

15   users over the lifetime of the turbine.  (ECF No. 199 at 10 (citing ECF No. 199-10 at 21, 27–28).)

16        Given this continuing duty to warn, the Court finds the 1972 letter creates a triable issue

17   of fact as to whether General Electric would have known or had reason to know that the turbine

18   aboard the Golden Bear II was dangerous for its intended use.

19                   c)      *Whether General Electric had Reason to Believe the*

20                           *Turbine's Users Would Realize the Danger*

21        As for the third and final element of *DeVries*, the Court examines whether General

22   Electric had any reason to believe that the turbine's users would realize the asbestos danger.  586

23   U.S. at 457.  General Electric argues Plaintiffs cannot establish the third element, because the

24   evidence demonstrates General Electric had every reason to believe the Navy, MARAD, Coast

25   _____

26   [11]    General Electric objects to this letter arguing it is irrelevant, misleading, confuses issues,
     and wastes time.  (ECF No. 209-1 at 9.)  At the summary judgment stage, the focus is not on the

27   "admissibility of the evidence's form," but rather on the "admissibility of its contents."  *Fraser v.*
     *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Here, the Court finds the letter's contents

28   admissible and therefore OVERRULES this objection.

1   Guard, California, and California Maritime Academy were fully aware of the potential hazards

2   posed by asbestos. (ECF No. 179-1 at 20–21.) However, again, the Court finds Plaintiffs have

3   raised triable issues of fact as to whether the end user of the product — Mr. Payne — would

4   realize the asbestos hazards to which he was exposed. *See Spurlin*, 537 F. Supp. 3d at 1174

5   (similarly examining knowledge of product's end user: Naval sailors).

6          Plaintiffs cite to Mr. Payne's deposition where he recalls a General Electric representative

7   ("representative") who came aboard the Golden Bear II in 1975 and observed the inspection of

8   the turbine. (ECF No. 199 at 8 (citing ECF No. 199-7 at 12–13).) The representative's report

9   states he arrived while the turbine cover was still on. (*Id.* (citing ECF No. 199-23; ECF No. 199-

10  24).) He then "inspected the turbine internally" and made recommendations. (ECF No. 199-24 at

11  5.) According to Plaintiff, the representative would therefore have seen the lack of precautions

12  being taken by the students. (*Id.*) From this, a jury could find General Electric had reason to

13  believe the end users were unaware of the danger, because the General Electric's representative

14  witnessed Plaintiff and other students working on the turbine without taking appropriate

15  precautions. Accordingly, the Court therefore finds a genuine dispute of material fact as to

16  whether General Electric had any reason to believe the end users would realize the dangers of the

17  integrated product. For these reasons, General Electric's Motion for Summary Judgment as to

18  duty to warn under *DeVries* is DENIED.

19                    iv.       *Claims for Non-Pecuniary Loss under Maritime Law*

20         Lastly, General Electric argues maritime law bars Plaintiffs' claims for loss of consortium

21  and punitive damages because historical evidence suggests such damages are not available. (ECF

22  No. 179-1 at 21 (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990); *The Dutra Group v.*

23  *Batterton*, 588 U.S. 358, 370 (2019).) Plaintiffs disagree and argue the Supreme Court's decision

24  in *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414 (2009) and Ninth Circuit authority

25  demonstrate "punitive damages have long been available for egregious conduct and wanton

26  recklessness under general maritime law." (ECF No. 199 at 21–22 (citing *In re Exxon Valdez*,

27  270 F.3d 1215, 1244 (9th Cir. 2001).) Plaintiffs also cite several district court cases outside this

28  circuit that declined to find punitive damages were barred under maritime law. (*Id.* (citing *Cook*

1    *v. Foster Wheeler Energy Corp.*, No. 1:21-CV-11362-ADB, 2023 WL 5672896, at *3 (D. Mass.

2    Sept. 1, 2023); *Pelton v. John Crane, Inc.*, No. 1:21-CV-4316, 2024 WL 361425, at *10 (N.D. Ill.

3    Jan. 31, 2024).)  In reply, General Electric argues Plaintiffs concede that loss of consortium

4    damages are not permitted.  (ECF No. 209 at 10.)  As for punitive damages, General Electric

5    contends Plaintiffs mischaracterize the Supreme Court's holding in *Townsend* and fail to provide

6    evidence that punitive damages were ever historically available for any of their claims under

7    general maritime law.  (*Id.* at 11 (citing 557 U.S. 404).)

8         To determine which types of damages plaintiffs may seek under general maritime law,

9    courts look to: (1) whether the relief sought has "long been available"; (2) whether conformity

10   with parallel statutory schemes would require such damages; and (3) whether policy grounds

11   compel the court to allow punitive damages.  *Batterton*, 588 U.S. at 369.

12        At the outset, the Court notes Plaintiffs do not provide evidence or argument regarding the

13   historical availability for loss of consortium damages.  (*See* ECF No. 199 at 21–23.)  Absent a

14   showing from Plaintiffs that a clear historical pattern exists, the Court finds General Electric is

15   entitled to summary judgment on the loss of consortium claim.  *See also Smith v. Trinidad Corp.*,

16   992 F.2d 996, 996 (9th Cir. 1993) (agreeing with the Fifth Circuit that the Supreme Court's

17   decision in *Miles* "effectively overruled" loss of consortium claims filed under the Jones Act or

18   under general admiralty law); *Elorreaga v. Rockwell Automation, Inc.*, No. 21-CV-05696-HSG,

19   2022 WL 2528600, at *5 (N.D. Cal. July 7, 2022) (noting the Ninth Circuit has found "actions for

20   loss of consortium are precluded under both the Jones Act and under general maritime law").

21        As for showing that punitive damages have been traditionally recoverable in general

22   maritime actions, Plaintiffs rely on the Supreme Court's decision in *Townsend*.  (ECF No. 199 at

23   21.)  However, as General Electric notes in reply, *Townsend* is distinguishable from the instant

24   matter.  (*See* ECF No. 209 at 10.)  In *Townsend*, the Supreme Court held an injured seaman was

25   not precluded from recovering punitive damages for his employer's willful failure to pay

26   maintenance and cure because historically such damages had been available in general maritime

27   actions.  557 U.S. at 407.  Here, General Electric did not employ Mr. Payne and Plaintiffs do not

28   bring any claim on the basis of failure to pay maintenance and cure.  However, *Townsend* did not

16

1    limit punitive damages under maritime law to *only* maintenance and cure claims as General

2    Electric appears to suggest.  Instead, in making its finding, the Supreme Court reasoned,

3    "[h]istorically, punitive damages have been available and awarded in general maritime actions[.]"

4    *Id.*

5        In 2019, the Supreme Court considered whether punitive damages were available in

6    unseaworthiness actions.  *Batterton*, 588 U.S. at 361.  There, the Court noted that plaintiff

7    presented "no decisions from the formative years of the personal injury unseaworthiness claim in

8    which exemplary damages were awarded."  *Id.* at 372.  Without such decisions, the Court

9    concluded "unlike maintenance and cure, unseaworthiness did not traditionally allow recovery of

10   punitive damages."  *Id.*

11       Here, the Court finds Plaintiffs have presented sufficient caselaw addressing the historical

12   availability of punitive damages for negligence claims under maritime law.  Plaintiffs cite *In re*

13   *Exxon Valdez*, a Ninth Circuit case that arose after an oil tanker crashed into the Bligh Reef in

14   Alaska, spilling eleven million gallons of oil.  (ECF No. 199 at 22 (citing 270 F.3d 1215, 1221

15   (9th Cir. 2001).)  Exxon stipulated that its negligence caused the oil spill.  *In re Exxon Valdez*,

16   270 F.3d at 1225.  Following trial, the jury awarded $5 billion in punitive damages against

17   Exxon.  *Id.*  On appeal, the Ninth Circuit found punitive damages were allowable, but the award

18   was too high.  *Id.* at 1246–47.  The Ninth Circuit expressly rejected Exxon's argument on the

19   availability of punitive damages, citing *The Amiable Nancy*, 16 U.S. 546, 558 (1818) and other

20   cases where punitive damages were allowable under maritime law.  *Id.* at 1226.  The Court

21   therefore finds Plaintiff has sufficiently established punitive damages have historically been

22   awarded in general maritime cases for negligence.

23       The Court notes that District courts are split on whether negligence has historically

24   permitted punitive damages under maritime law.  *See Pelton*, 2024 WL 361425, at *10 n.11

25   (collecting cases).  However, because the Court finds Plaintiffs have sufficiently met their burden

26   by showing punitive damages have been traditionally awarded in maritime negligence cases, the

27   Court finds punitive damages are available for Plaintiffs' negligence claim under general

28   maritime law.  *Cf. Spurlin v. Air & Liquid Sys. Corp.*, 537 F. Supp. 3d 1162, 1181 (S.D. Cal.

17

1    2021) (finding Plaintiff provided no evidence that punitive damages were traditionally awarded in

2    maritime negligence cases and granting defendants' motion for summary judgment on that basis).

3         Turning to whether conformity with parallel statutory schemes would require such

4    damages, Plaintiffs argue no such statute exists, General Electric provides no evidence to the

5    contrary, and the Court is unaware of any such statutory scheme.  (ECF No. 199 at 22.)

6         As for whether public policy grounds should compel this Court to allow for punitive

7    damages, Plaintiffs argue such damages would deter other asbestos manufacturers from "ignoring

8    the safety of their products in search of higher profits."  (*Id.* at 22–23.)  General Electric does not

9    respond to this argument in reply and the Court is persuaded by Plaintiffs' reasoning that public

10   policy compels the allowance for punitive damages under the circumstances.

11        In sum, the Court DENIES General Electric's Motion for Summary Judgment as to

12   punitive damages and GRANTS General Electric's Motion for Summary Judgment as the loss of

13   consortium claim.

14          B.     <u>Plaintiffs' Motion for Summary Adjudication</u>

15        Plaintiffs seek summary adjudication as to various affirmative defenses raised by General

16   Electric and Redco.[12]  (ECF No. 178.)  The Court examines each defense in turn.

17            i.     *Government Contractor Affirmative Defense*

18        First, Plaintiffs seek summary adjudication as to General Electric and Redco's

19   (collectively, "Defendants") government contractor defense.[13]  (ECF No. 178 at 8–12.)  This

20   defense "immunizes contractors who supply military equipment to the Government from the

21   duties imposed by state tort law."  *In re Hawaii Fed. Asbestos Cases ("In re Hawaii")*, 960 F.2d

22   806, 810 (9th Cir. 1992).  For this defense to apply, Defendants must establish: "(1) the United

23   States approved reasonably precise specifications; (2) the equipment conformed to those

24   specifications; and (3) the supplier warned the United States about the dangers in the use of the

25   equipment that were known to the supplier but not the United States."  *Boyle v. United Techs.*

26   [12]     Redco Corporation was formerly known as Crane Co.  (ECF No. 196 at 6.)

27
28   [13]     Plaintiffs title the heading "Sophisticated User Affirmative Defense" but given the
     context, the Court construes this section to relate to the Government contractor defense.

1    *Corp.*, 487 U.S. 500, 512 (1988). In opposition, both Defendants argue disputes of fact preclude

2    summary adjudication. (ECF No. 197 at 17; ECF No. 196 at 6–9.) The Court examines each

3    prong of the defense in turn.

4                                        *a)      Prong One: United States Approval of Specifications*

5            At the outset, Plaintiffs argue Defendants cannot prove that the United States approved

6    reasonably precise specifications for the Golden Bear II. (ECF No. 178 at 9.) Relying on

7    Moore's report, Plaintiffs argue the Golden Bear II was built under a U.S. Maritime Commission

8    contract as the S.S. Del Orleans by the Bethlehem Steel Shipyard and was operated by the

9    Mississippi Shipping Company before being acquired by the Navy. (*Id.* (citing ECF No. 178-4 at

10   5).) Plaintiffs contend the Golden Bear II was not built for the Navy, was not in the Navy's

11   possession during Mr. Payne's exposure, and therefore Naval specifications did not apply. (*Id.*)

12           In opposition, General Electric argues Plaintiffs ignore the Navy's involvement in

13   approving the ship design and equipment capabilities of the S.S. Del Orleans. (ECF No. 197 at

14   18.) Citing Christopher P. Herfel's report, General Electric argues the Navy had control over the

15   design and equipment capabilities of the S.S. Del Orleans because the S.S. Del Orleans was

16   required to meet the Navy's specifications and plans. (*Id.* at 19 (citing ECF No. 197-10 at 601).)

17           Given the conflicting expert reports, the Court finds there is a dispute of fact as to whether

18   the United States approved reasonably precise specification that applied to the S.S. Del Orleans.

19                                        *b)      Prong Two: Conforming Equipment*

20           Even if Navy specifications applied, Plaintiffs argue this defense fails because

21   Defendants' equipment did not conform to the Navy specification requiring them to warn of

22   hazards from their products. (ECF No. 178 at 9–10.) Plaintiffs cite again to Moore's report

23   where he discussed the evolution of military specifications, which starting in 1936, "required

24   manufacturers to provide installation, operating and maintenance instructions as well as 'safety

25   precautions' as an essential part of Instruction Books for machinery and electrical equipment."

26   (*Id.* (citing ECF No. 178-4 at 41).)

27           In opposition, General Electric argues Plaintiffs' citation to Moore's report is unavailing

28   because Moore previously testified that he was not aware of any document issued by the Navy

                                                        19

1  requiring an asbestos warning.[14] (ECF No. 197 at 20.)  The Court finds this testimony does not

2  contradict or otherwise undermine Moore's report.  Rather, this evidence raises a question of fact

3  — a reasonable juror could conclude that "safety precautions" requirement includes warnings

4  about asbestos even if not explicitly stated.  As such, the Court finds this prong is another

5  question for the jury.

6                          *c)*      *Prong Three: Warning*

7        Finally, Plaintiffs argue the contractor defense fails under the third prong because the

8  Navy did not consider asbestos to be a hazard during the relevant time period.  (ECF No. 178 at

9  11.)  Plaintiffs cite to General Electric's expert who concluded that the government did not

10  consider Navy-related asbestos exposure hazardous until the implementation of Occupational

11  Safety and Health Administration regulations in the 1970s.  (*Id.* (citing ECF No. 178-6 at 7).)

12        In opposition, both Defendants argue the evidence demonstrates it was not aware of

13  hazards of which the government was unaware.[15] (ECF No. 197 at 21–22; ECF No. 196 at 9.)

14  Redco cites an expert report that states the Navy knew as much, if not more than Crane Co. (now

15  Redco) about the dangers of asbestos.  (ECF No. 196 at 9.)  Redco also argues third-party

16  manufacturers would not have been allowed to include warnings relating to asbestos on

17  equipment or products.  (ECF No. 196 at 8 (citing ECF No. 196-4 at 28).)

18        Based on the evidence presented, a genuine issue of fact remains as to: (1) whether

19  Defendants were aware of dangers associated with the use of their equipment of which the United

20  _____

21  [14]    The Court acknowledges General Electric provides a string cite of cases from the Eastern
District of Pennsylvania that it claims found defendants in asbestos cases were entitled to
22  summary judgment on the government contractor defense.  (ECF No. 197 at 21.)  General
Electric does not explain how the analysis in those opinions apply here.  On this record, genuine
23  disputes of fact exist as to each prong of the *Boyle* test.

24  [15]    General Electric also argues that if Plaintiffs are correct that the Navy did not consider
asbestos packing and gaskets to be hazardous in the 1930s, then Plaintiffs' argument that any
25  warning was required for those products is "frivolous." (ECF No. 197 at 22.)  The Court finds
this argument unconvincing.  Whether the Navy considered General Electric's products to be
26  hazardous has no bearing on General Electric's own duty to warn users of hazards known to
General Electric.  What the Navy knew and did with that knowledge, and what General Electric
27  knew and did with that knowledge, are separate matters.

28

1    States was not aware; and (2) whether Defendants would have been able to warn the United

2    States about asbestos on the equipment or products.

3         In sum, because disputes of fact remain for each of the prongs of the government

4    contractor defense, Plaintiffs' Motion for Summary Adjudication as to this defense is DENIED.

5         *ii.*      *Sophisticated User Affirmative Defenses*

6         Next, Plaintiffs seek summary adjudication on Defendants' sophisticated user defenses.

7    (ECF No. 178 at 12–13.) At the outset, the Court notes the parties' briefing also raises issues

8    concerning the "sophisticated intermediary" or "sophisticated purchaser" defense. (*See Id.*; ECF

9    No. 196 at 10–16.) Courts "have at times referred to these terms interchangeably and/or

10   inconsistently." *Cabasug v. Crane Co.*, 988 F. Supp. 2d 1216, 1219 (D. Haw. 2013). For clarity,

11   this Court begins by discussing the sophisticated user defense, before turning to the sophisticated

12   purchaser or intermediary defense.

13        For the sophisticated user defense to apply, Defendants must establish that the ultimate

14   end-user of the product — Mr. Payne — was a "sophisticated user of the product." Cabasug, 988

15   F. Supp. 2d at 1219. A "sophisticated user" is an "end user who either knew or belonged to a

16   class of users who, by virtue of training, education, or employment could reasonably be expected

17   to know of the hazards of the product at issue." *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 343

18   (E.D. Pa. 2012).

19        General Electric withdrew this defense in opposition "given evidence elicited since the

20   filing of its answer[.]" (ECF No. 197 at 26.) However, Redco maintains its defense arguing the

21   evidence demonstrates Mr. Payne was a sophisticated user of asbestos-containing products and

22   components. (ECF No. 196 at 10–16.) In reply, Plaintiffs argue Redco has provided no evidence

23   that Mr. Payne was a "sophisticated user" as to the hazards of asbestos. (ECF No. 207 at 9.)

24        The Court disagrees with Plaintiffs. To support its position, Redco presents several pieces

25   of evidence. First, Redco presents testimony from Mr. Payne's classmate at the California

26   Maritime Academy who recalled hearing during instruction that "asbestos [was] hazardous. And

27   it could . . [cause] permanent breathing problems[.]" (*Id.* at 15 (citing ECF No. 196-7 at 3, 4).)

28   Second, Redco points to another one of Mr. Payne's classmates who testified that the students at

21

1  the California Maritime Academy "should have received more training about the dangers and

2  exposure of asbestos" because people in the industry were aware of the dangers of asbestos but

3  could not recall receiving such training. (*Id.* (citing ECF No. 196-8 at 22, 107–08).) Third,

4  Redco notes Mr. Payne testified that information about asbestos was "widely known in the mid-

5  1970s" and the California Maritime Academy "should have warned us." (*Id.* (citing ECF No.

6  196-6 at 4).) Viewing the evidence in the light most favorable to Redco, the Court finds there is

7  triable issue of material fact as to whether Mr. Payne was aware and/or reasonably should have

8  been aware about the dangers of asbestos. Therefore, Plaintiffs' Motion for Summary

9  Adjudication as to Redco's sophisticated user defense is DENIED. Further, the Court finds

10  Plaintiffs' Motion for Summary Adjudication as to General Electric's sophisticated user defense

11  moot.

12  *iii.   Sophisticated Purchaser Affirmative Defense*

13  The Court however finds summary adjudication is warranted on the sophisticated

14  purchaser defense. Under the sophisticated "purchaser" or "intermediary" defense, Defendants

15  are not liable for harm caused to an ultimate-end user — Mr. Payne — if they establish that they:

16  (1) knew that an intermediary —such as the Navy or the California Maritime Academy — was

17  aware of the dangers of asbestos, and (2) reasonably concluded that the intermediary would

18  provide warnings to its employees. *Cabasug*, 988 F. Supp. 2d at 1219. Here, Plaintiffs argue this

19  Court should follow *Mack*, 896 F. Supp. 2d 333. (ECF No. 178 at 12–13.) In *Mack*, the court

20  determined that due to several policy considerations, the sophisticated intermediary defense was

21  not available under maritime law. 896 F. Supp. 2d at 342. The court there reasoned allowing this

22  defense would run counter to the goals of maritime law because it could "discourage work at sea"

23  and leave Navy seamen and their survivors with no remedy. *Id.* at 342–43.

24  In opposition, Redco argues this Court should depart from *Mack* and instead follow

25  *Cabasug*, where the District of Hawaii found the sophisticated purchaser defense was available

26  under maritime law under certain circumstances. (ECF No. 196 at 13 (citing 988 F. Supp. 2d at

27  1219).) There, the court examined *Mack* as well as other cases decided under different state laws.

28  988 F. Supp. 2d at 1226. From these decisions, the *Cabasug* court "distill[ed] the following

22

1   principles: Defendants cannot take benefit of the sophisticated purchaser defense unless they can

2   establish that they knew that the Navy was aware of the dangers of asbestos and that Defendants

3   reasonably concluded that the Navy would provide warnings to its employees." *Id.* at 1228.

4   "[E]vidence of the Navy's knowledge of the dangers of asbestos, on its own, is insufficient to

5   sustain the sophisticated purchaser defense under maritime law." *Id.* Rather, in the asbestos

6   context, "there must be some reason, beyond the employer's sophistication, for the defendant's

7   belief that the employer will provide warnings to its employees." *Id.*

8          The Court finds it need not undertake an extensive inquiry into the availability of the

9   sophisticated purchaser defense under maritime law because even if the Court were to agree with

10  Redco and follow *Casabug* as Redco requests, summary adjudication is still warranted. While

11  Redco produces evidence of the Navy's knowledge about the dangers of asbestos, it does not

12  produce evidence that Redco: (1) warned the Navy or the California Maritime Academy

13  (collectively "intermediaries") about the dangers of asbestos; (2) determined the intermediaries'

14  knowledge; or (3) determined or otherwise concluded that the intermediaries would warn

15  Mr. Payne regarding the asbestos dangers. *See Cabasug*, 988 F. Supp. 2d at 1228 (finding

16  defendants cannot establish the sophisticated purchase defense because they failed to provide this

17  evidence). As such, Plaintiffs' Motion for Summary Adjudication as to Redco's sophisticated

18  purchaser defense is GRANTED.

19                        *iv.  Superseding Cause Affirmative Defense*

20         Finally, Plaintiffs seek summary judgment as to Defendants' superseding cause defense.

21  (ECF No. 178 at 13–15.) Relying on *In re Hawaii*, Plaintiffs argue Defendants have not

22  established California Maritime Academy's actions were unforeseeable. (*Id.* at 13.)

23         In opposition, both Defendants argue the evidence demonstrates the California Maritime

24  Academy knew of the asbestos dangers aboard their ships.[16] (ECF No. 197 at 23–24; ECF No.

25  196 at 16.) In reply, Plaintiffs argue Defendants have not established California Maritime

26

27  _____

    [16]    General Electric also argues it has presented evidence that it did not direct the
28  incorporation of asbestos insulation onto its turbine, nor did it incorporate the asbestos insulation
    itself. However, as discussed above, these facts are in dispute.

                                    23

1    Academy's actions were unforeseeable.  (ECF No. 207 at 8–9.)  Further, Plaintiffs contend the

2    General Electric representative physically present during the work on the turbine saw that no

3    safety precautions were taken when Mr. Payne was exposed.  (*Id.* at 9.)

4        "The doctrine of superseding cause is applied where the defendant's negligence in fact

5    substantially contributed to the plaintiff's injury, but the injury was actually brought about by a

6    later cause of independent origin that was not foreseeable.  It is properly applied in admiralty

7    cases."  *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996).  It "operates to cut off the

8    liability of an admittedly negligent defendant."  *Id.* at 837–38.

9        In *In re Hawaii*, the Ninth Circuit considered defendant asbestos insulation manufacturers

10    and suppliers' argument that actions of the Navy were a superseding cause of plaintiffs' injuries.

11    960 F.2d at 814.  The Ninth Circuit determined that regardless of the Navy's failure to provide

12    proper warnings and safety devices to its workers, there was no evidence to suggest that the

13    manufacturers and suppliers could not have foreseen the Navy's omissions.  *Id.* at 815.  Because

14    Hawaii law dictated a third party's superseding actions only cut off an earlier tortfeasor's liability

15    when the third party's conduct was so unusual, out of the ordinary, or unforeseeable, the Ninth

16    Circuit upheld the district court's ruling that the Navy's actions were not a superseding cause.  *Id.*

17        Relevant here, California law follows the Restatement (Second) of Torts § 442.  *See*

18    *Pappert v. San Diego Gas & Elec. Co.*, 137 Cal. App. 3d 205, 210 (1982).  Section 442 lists

19    several considerations relevant to determining whether an intervening force is a superseding

20    cause.  Pertinent here are: "(a) [w]hether the intervention brings about harm different in kind from

21    that which would otherwise have resulted from the actor's negligence"; and "(b) [t]he fact that its

22    operation or the consequence thereof appear after the event to be extraordinary rather than normal

23    in view of the circumstances existing at the time of its operation[.]"  Restatement (Second) of

24    Torts § 442.

25        Defendants have not produced any evidence demonstrating the California Maritime

26    Academy's — or any other entity's — failure to warn produced a harm "different in kind" or was

27    "extraordinary."  Moreover, as Plaintiffs' note, there is evidence to suggest General Electric's

28    representative saw Mr. Payne and others aboard the Golden Bear II work on the turbine without

1  taking safety precautions.  (ECF No. 208 at 20.)  Plaintiffs' Motion for Summary Judgment as to

2  Defendants' superseding cause defense is therefore GRANTED.  *See Smargisso v. Air & Liquid*

3  *Sys. Corp.*, 750 F. Supp. 3d 1046, 1069 (N.D. Cal. 2024) (similarly granting plaintiffs' motion for

4  summary judgment as to superseding cause defense due to defendants' failure to produce

5  evidence that the Navy's failure to warn was unforeseeable).

6      **V.**    **CONCLUSION**

7      For the foregoing reasons, the Court GRANTS in part and DENIES in part General

8  Electric's Motion for Summary Judgment (ECF No. 179) and GRANTS in part and DENIES in

9  part Plaintiffs' Motion for Summary Adjudication (ECF No. 178) as follows:

10      •  GRANTS General Electric's Motion for Summary Judgment for the loss of

11         consortium claim and DENIES General Electric's Motion on all other grounds;

12      •  DENIES Plaintiffs' Motion for Summary Adjudication as to Defendants'

13         government contractor defense;

14      •  DENIES Plaintiffs' Motion for Summary Adjudication as to Redco's sophisticated

15         user defense and finds Plaintiffs' Motion for Summary Adjudication as to General

16         Electric's sophisticated user defense moot;

17      •  GRANTS Plaintiffs' Motion for Summary Judgment as to Redco's sophisticated

18         purchaser defense and Defendants' superseding cause defense.

19      The parties are hereby ordered to file a Joint Notice of Trial Readiness within thirty (30)

20  days of the electronic filing date of this Order indicating their readiness to proceed to trial on

21  Plaintiffs' remaining claims.

22      IT IS SO ORDERED.

23  Date: September 25, 2025

24

25

26  _____

    TROY L. NUNLEY

27  CHIEF UNITED STATES DISTRICT JUDGE

28